**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
INDIANAPOLIS DIVISION

JANE DOE 4,

     Plaintiff,

     v.

BUTLER UNIVERSITY;                                    Case No.
MICHAEL HOWELL, individually and as
an agent of Butler University; and                    Hon.
RALPH REIFF, individually and as an
agent of Butler University;

     Defendants.

_____

## COMPLAINT AND JURY DEMAND

Plaintiff Jane Doe 4,[1] by and through her attorneys, The Fierberg National Law Group,

PLLC and Cohen & Malad, LLP, brings this action against Defendants Butler University

("Butler"), Michael Howell, and Ralph Reiff for negligence, gross negligence, battery, assault,

and intentional infliction of emotional distress, and states and alleges as follows:

## INTRODUCTION

1.     Butler athletic trainer, Defendant Michael Howell, groomed and sexually

assaulted Jane Doe 4 and numerous other members of the Butler women's soccer team. The

assaults and sexual misconduct – which included Howell rubbing his erect penis against female

players and dripping his sweat on the athletes as he groped their outer vaginal areas, breasts, and

---

[1] This case is one of four filed in this Court on behalf of female athletes injured at Butler and by these named Defendants under substantially similar circumstances. *See* 1:23-cv-01302-JRS-MKK; 1:23-cv-01303-JRS-MKK;1:23-cv-01306-JRS-MKK. Pursuant to S.D. Ind. L.R. 10-1, Plaintiff is contemporaneously filing under seal a Notice of Intention to Seek Leave to Proceed under Pseudonym and a Motion to Proceed Under Pseudonym.

nipples – trace back many years and were perpetrated in Butler's training room, offices, buses, and in Howell's private hotel rooms as he traveled with the team for away games; locations and times when Howell was presumably under the supervision of Defendant Ralph Reiff, Butler's Senior Associate Athletic Director for Student-Athlete Health, Performance and Well-Being, and, more generally, the co-head coaches for the Butler women's soccer team, Tari St. John and Robert Alman.

2.      Howell's misuse of his position of power and authority over Butler athletes and deviation from standard practices were numerous and obvious. Defendant Reiff did not do anything reasonably required to investigate the circumstances, train the coaches, keep Howell or the athletes under watch, promulgate or request the implementation of safety policies, or otherwise protect multiple women as they were repeatedly abused by Howell in various locations on and off campus over extended periods of time.

3.      Defendant Reiff, Howell's direct supervisor, knew that athletic massages typically last no more than 10 minutes, focus solely on the target area, and should be used sparingly only when no other method is effective. However, Howell routinely gave Ms. Doe and other athletes full body massages that lasted an hour or more, often taking them to locations (such as his private hotel room at away games as opposed to conference rooms available for training) outside the direct sightline of supervising staff. Nevertheless, Defendant Reiff and the coaches never inquired, investigated, raised questions about the safety of the female athletes, or implemented or followed safety protocols. Upon information and belief, Defendant Reiff failed to ensure that athletic staff, coaches St. John and Alman, and student-athletes were provided with protocols or attended trainings that would identify the safety standards and practices for the treatment by trainers of female athletes.

2

4.      Howell began sexually assaulting Ms. Doe when she was a sophomore and continued to abuse her until her senior year at Butler by, among other things, touching her breasts, labia, and groin; lifting her undergarments and clothing to expose and view her breasts and genitalia; rubbing his penis and erection against her outstretched hands; and pressing his groin against her buttocks. Multiple versions of this and other gross misconduct were perpetrated upon Ms. Doe, causing her substantial emotional, physical, and other injuries and damages. Unfortunately, Howell perpetrated similar misconduct on other athletes.

5.      When Ms. Doe and five other young women reported Howell's misconduct, including the fact that he was surreptitiously photographing and videotaping athletes, Butler selected and retained independent legal counsel to investigate the allegations and make findings of fact under the demanding standards of Title IX of the Educational Amendments of 1972. However, Butler alerted Howell to the investigation before contacting law enforcement or seizing his work-issued phone, allowing Howell to destroy and/or transfer likely lurid photographs and videos taken of the athletes.

6.      Following an extensive investigation and fact-finding hearings, a panel of outside attorneys who served as decision makers ("Title IX Panel" or "Panel") confirmed the gravamen of the allegations, concluded that Butler did not have a formal policies and procedures manual for its athletic trainers, lacked necessary safety protocols, and emphasized Howell's stark deviations from standard practices. The Title IX investigation also revealed that Defendant Reiff knew that Howell created a "bubble" around the women's soccer players, and St. John was aware that this culture could have deterred players from coming forward and reporting Howell.

7.      The Title IX Panel concluded that Howell had forged a trusting relationship with Ms. Doe, which he "manipulated in order to push the boundaries of acceptable behavior, slowly

3

and steadily, until the sexual touching occurred." The Panel determined that Howell had sexually assaulted and sexually harassed Ms. Doe and other young women on the soccer team, and that "[t]he harm to [Ms. Doe] was severe and the effects resulting therefrom are likely to be profound and lasting."

8.      This action is brought by Ms. Doe to recover her injuries and damages, compel Butler to institute safety protocols to protect other athletes, compel Butler to contact former student-athletes to assess whether they were also abused by Howell and need resources and assistance, prevent Howell from maintaining licensure that would give him the ability to abuse others, and to hold Defendants responsible for their acts and omissions that enabled a dangerous predator to gain unfettered access to and abuse her and many other young female athletes.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different States.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this judicial district and/or a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## PARTIES

11.     Plaintiff Jane Doe 4 is a legal resident of a State that is not Indiana.[2]

---

[2] Butler's website has included detailed information regarding the women's soccer team, including historical team rosters and each student-athlete's hometown and state, and any person could easily identify Ms. Doe's true name if she included her state of residence in this publicly available Complaint. To protect Plaintiff's identity and privacy, her state of residence is disclosed under seal in her Notice of Intention to Seek Leave to Proceed under Pseudonym.

12.    Defendant Butler is a private institution of higher education located and operating in Marion County, Indiana.

13.    Defendant Howell was an Assistant Athletic Trainer employed by and acting as an agent of Butler at all material times. Upon information and belief, Howell resides in Marion County, Indiana.

14.    Defendant Reiff was and remains the Senior Associate Athletic Director for Student-Athlete Health, Performance and Well-Being at Butler, employed by and acting as an agent of Butler at all material times.  Upon information and belief, Reiff resides in Marion County, Indiana.

## FACTUAL ALLEGATIONS

### *Defendants Butler, Howell, and Reiff*

15.    Butler is an NCAA Division I school, and its athletic teams, including women's soccer, compete in the Big East Conference.

16.    At all material times, Alman and St. John were the co-head coaches of the Butler women's soccer team.

17.    Butler employed Defendant Howell as an Assistant Athletic Trainer from the spring of 2012 until October 6, 2021. Howell was furloughed in the summer of 2020 due to COVID-19 and returned to Butler in the fall of 2020.

18.    During his tenure at Butler, Howell worked with the women's soccer, men's baseball, women's and men's golf, men's tennis, and cheerleading teams.

19.    At all material times, Butler assigned Howell as the sole athletic trainer for the women's soccer and men's tennis teams.

20.     Howell was responsible for physically treating women's soccer players to prevent and remedy injuries.

21.     At all material times, Defendant Reiff was Howell's direct supervisor as Howell provided training services to athletes on different teams.

22.     Defendant Reiff's responsibilities included coordinating all healthcare activities for Butler's sports teams and student-athletes, overseeing Butler's sports medicine department and strength and conditioning program, ensuring the implementation of safety protocols and training, and looking after the well-being of staff as well as students under the care of trainers supervised by Reiff.

### Butler Recruited Ms. Doe

23.     During high school, Ms. Doe was a highly accomplished soccer player and successful academically. Butler recruited Ms. Doe to play women's soccer.

24.     Like her teammates, Ms. Doe did not have much, if any, experience with staff athletic trainers before attending college.

### The "Breeze" - Howell's Routine Exposure of Female Athletes' Intimate Body Parts

25.     The Butler women's soccer team coined the term the "breeze" to describe when Defendant Howell would lift their bras, spandex, and underwear and air would rush over their breasts and vaginal areas. This phrase was widely used amongst the players.

26.     Neither Defendant Reiff nor Defendant Butler, through other staff, provided Ms. Doe and other female athletes training or education concerning proper protocols on athletic treatment and massage by trainers and personnel that would have direct physical contact with Butler's athletes, despite the well-known vulnerability of athletes to sexual exploitation at the

hands of team coaches, doctors, and other treatment providers who – as Defendant Reiff and Butler's coaches knew – stand in a unique position of power and authority over student-athletes.

27.     Due to this lack of training and education, among other things, Ms. Doe did not initially understand that it was inappropriate when Howell began lifting her undergarments and shorts and exposing her breasts and groin area during massages.

### Howell Maintained an Intimidating and Toxic Environment for Women Soccer Players

28.     Howell maintained an environment that Ms. Doe and other female soccer players found intimidating, toxic, and stressful.

29.     Howell demeaned the soccer coaches and soccer strength coach and claimed that he "decide[d] who plays" women's soccer, as known by Coach Alman.

30.     Coaches St. John and Alman did, in fact, defer to Howell with respect to which soccer team members could play at any given time.

31.     Ms. Doe felt that Howell had significant influence with the coaches regarding whether a student-athlete was permitted to practice or play.

32.     Howell bragged about training soccer players who had gone on to become professional athletes.

33.     During Ms. Doe's freshman year, Howell required her and other women soccer players to sign a contract pursuant to which they promised to abide by his rules.

34.     Howell's rules included, among other things, that once a student-athlete started receiving treatment from him for an injury, she could not stop treatment until released by Howell. If a student-athlete did not attend treatment with Howell, she was not permitted to practice or play.

35.     Howell was known to withhold treatment from athletes with whom he became upset or as a disciplinary consequence for student-athletes who were late to or missed appointments with him.

36.     Howell repeatedly told Ms. Doe and her teammates that he knew who they were dating, that boys and girls could not be friends, and the only reason any boy would ever want to be friends with a girl was for his own sexual interest or the sexual interest of one of his friends.

37.     Howell instructed the women soccer players that they should not fraternize with the men's soccer team.

38.     Howell tried to sow distrust and division between the women soccer players.

39.     During Ms. Doe's freshman year, she unsuccessfully "interviewed" with Howell to get into his special workout program.

40.     Coach St. John knew that due to the culture of the women's soccer program, and Coach Alman's closeness with Howell, it could be difficult for players to express any concerns they might have about Howell.

### *Howell Began Abusing Ms. Doe During Her Sophomore Year at Butler*

41.     Beginning in the fall of 2019, when Ms. Doe was a sophomore, and continuing until she and others reported him to Butler in September 2021, Howell leveraged his authority and power as an athletic trainer to groom, isolate, manipulate, sexually assault, and otherwise abuse Ms. Doe.

42.     One day during the fall semester, Howell pulled Ms. Doe into his office, closed the door and blinds, and asked her probing questions about her personal life to the point that he made her cry. Howell told Ms. Doe she could trust him, she could always come talk to him about her problems, and that he cared about her.

43.     That same fall, Ms. Doe sought assistance from Howell for pain in her trapezius muscle and neck.

44.     Howell's massage treatments began normally but gradually became increasingly invasive.

45.     Howell began slightly lifting Ms. Doe's sports bra during treatments.

46.     During treatment, Howell did not warn Ms. Doe when he was about to touch a sensitive area or ask if she was okay with the movement or placement of his hands on her body.

47.     On a team road trip, Ms. Doe needed treatment for her leg.

48.     Howell instructed her to come to his hotel room late at night for a treatment that began sometime between 10:30 p.m. and midnight.

49.     When Ms. Doe arrived at Howell's hotel room, she encountered a teammate leaving the room who looked dazed, as though she was half asleep.

50.     Howell was alone in the room with Ms. Doe.

51.     Howell instructed Ms. Doe to lie down on her stomach on one of the two beds in the hotel room, where he had dimmed the lights and closed the door.

52.     Howell massaged Ms. Doe's feet, calves, and hamstrings, then had her turnover, and he massaged her quads. The massage lasted approximately one hour.

53.     After that, whenever Ms. Doe was injured and on an away game trip, Howell provided her treatment in his or another person's private hotel room.

54.     In January 2020, Ms. Doe was ill and lost significant weight.

55.     When Ms. Doe returned to school that semester, Howell was involved in monitoring Ms. Doe's recovery and managing her nausea and weight, and he began giving her back massages unrelated to a specific condition or injury.

56.     Around this same time, Ms. Doe noticed that Howell was pushing her boundaries by moving her sports bra more and more each time he treated her.

57.     Howell began lifting Ms. Doe's sports bra progressively higher, to the point where her breasts were fully exposed to Howell and in his direct line of sight.

58.     Howell frequently grazed the sides of her breasts with his fingers, and Ms. Doe routinely saw that Howell was looking at her breasts. Howell did not apologize for this.

59.     Howell's treatment made Ms. Doe feel uncomfortable.

60.     Even though it was against Howell's rules, Ms. Doe took short breaks from treatment and risked being held out of activity rather than be treated by Howell.

61.     On one occasion when she returned to treatment, Howell asked, "Oh, [Ms. Doe], are we done fighting now?"

62.     Ms. Doe began wearing two sports bras and had a teammate accompany her to treatment. Howell asked the teammate to move across the room, and when she refused Howell expressed extreme displeasure at the teammate and Ms. Doe.

63.     Howell tried to isolate Ms. Doe when he "treated" her.

64.     Ms. Doe experienced increasing anxiety over her interactions with Howell.

65.     Ms. Doe suffered an injury to her iliotibial band ("IT band").

66.     Howell treated Ms. Doe's IT band by, among other things, massaging her from the outside of her knee to her inner leg and inner groin area.

67.     Some of the treatments occurred in the windowless physician's office, where Howell and Ms. Doe were alone, which caused her to suffer anxiety.

68.     During each IT band treatment, Howell lifted Ms. Doe's spandex shorts further away from her skin, exposing her groin area.

10

69.     Ms. Doe began wearing underwear under her spandex shorts for treatment, to feel more protected, but Howell pulled and stretched out her undergarments.

70.     Howell massaged Ms. Doe's inner groin area under her clothing, toward her underwear line. When this happened, Howell's breathing became heavier, and he began sweating.

71.     Howell brushed Ms. Doe's labia with a part of his finger at least once during an IT band treatment.

72.     Notably, Ms. Doe had not complained of groin pain or sought treatment for her groin.

73.     Howell's treatments for Ms. Doe's IT band injury lasted until spring break of 2020.

74.     Ms. Doe felt afraid, anxious, and paralyzed during Howell's treatments.

75.     She began to experience a marked acceleration of her heart rate during Howell's treatments, even those that did not involve massage.

76.     Ms. Doe experienced asthma attacks after she fell ill in early 2020, and Howell provided an inhaler to her. Ms. Doe later discovered that the inhaler required a doctor's prescription.

77.     The women's soccer team members did not return to campus during the spring of 2020 because of COVID-19.

78.     Howell called Ms. Doe at some point during the spring to check on her, learned Ms. Doe was undergoing some challenges, and said she could stay with him at his house. Ms. Doe thought this was strange but brushed it off.

### *Howell Continued Sexually Abusing Ms. Doe During Her Junior Year at Butler*

79.     When Ms. Doe returned to Butler in the fall of 2020, Howell continued to treat her.

80.     Howell also continued lifting Ms. Doe's clothing and undergarments and exposing her breasts and groin area during the treatments.

81.     Howell had Ms. Doe do stretching exercises for her IT band on a treatment table, during which he routinely stood behind her and pressed his groin up against her buttocks, making her uncomfortable. After Howell was dismissed from Butler, Ms. Doe learned from experience with another trainer that Howell's close physical contact with her was unnecessary for the stretch; the other trainer stood a foot away from her during the same exercise.

82.     In spring of 2021, the Butler women's soccer team competed in the Big East tournament semifinal in Providence, Rhode Island.

83.     On that trip and others, Howell did not treat athletes in the conference room that Butler had reserved.

84.     Instead, Howell treated female soccer players in his and their private hotel rooms, which the coaches knew.

85.     During the same tournament, Howell required some women's soccer players to take ice baths in his hotel bathroom. He gave them the impression that this was non-negotiable.

86.     On that Big East tournament trip, Howell massaged Ms. Doe in her hotel room.

87.     This massage was longer than usual, and Howell lifted Ms. Doe's spandex and clothing more extensively than ever.

88.      Ms. Doe felt completely exposed.

12

89.     When Howell finished and left Ms. Doe's room, she suffered an anxiety attack, called her boyfriend in a panic, wanted to quit soccer, and hid in the bathroom, unable to regain her composure.

### *Howell Provide Special Training for Ms. Due During the Summer of 2021*

90.     Howell offered to help Ms. Doe with strength training during the summer of 2021, when she was living in campus.

91.     For a few weeks, once a week, she met with Howell in the Butler weight room at 6 a.m., when they usually were the only people there, and he put her through a workout he had prepared for her.

92.     As an athletic trainer, it was not Howell's job to provide workouts or training programs for athletes, and it was inappropriate for him to do so.

### *Howell Rubbed His Penis against Ms. Doe During Her Senior Year at Butler*

93.     During the fall semester of the 2021-2022 academic year, Howell again called Ms. Doe into his office and pried into her personal issues, including by asking questions about her boyfriend.

94.     Ms. Doe felt trapped, and that Howell would not permit her to leave until she cried.

95.     Howell told her that he cared about her and could call her at any time, even at two o'clock in the morning.

96.     That same semester, Ms. Doe sought treatment for lower back pain.

97.     Defendant Reiff assisted Howell in providing treatment for Ms. Doe with a device that realigned her hips and relieved her pain.

98.     A week later, Ms. Doe sought treatment when the pain returned, expecting the same treatment that had been successful in alleviating the pain.

99.     Rather than use the method that had previously worked, Howell gave Ms. Doe a full-body massage that lasted close to an hour.

100.     Howell had Ms. Doe lie face down on her stomach with her shirt off, wearing her sports bra.

101.     Howell massaged Ms. Doe's arms and hands and moved her hands from being wrapped around her head to hanging off the edge of the table.

102.     Howell rubbed his genitalia against her hands at least three times, for progressively longer periods of time, and his breath became heavier and quicker. Howell did not apologize.

103.     Howell began sweating profusely, and his sweat dripped onto Ms. Doe's body.

104.     The final time Howell's groin contacted her hands, Ms. Doe felt that his penis was hard. Howell had positioned himself so that she had no way of moving her hands elsewhere.

105.     Ms. Doe was disgusted and felt frozen on the table.

106.     Howell began lightly stroking Ms. Doe's head and then suddenly walked away without explanation.

107.     Ms. Doe could not see where Howell had gone. He had not returned to his office, which she would have been able to see.

108.     After a minute or two, Howell returned and said "okay, we're done."

### Howell Secretly Photographed and Recorded Female Athletes

109.     Howell secretly photographed and video recorded members of the women's soccer team, including when they were sleeping on the bus while traveling to away games.

14

110.    Howell once was showing an athlete a video of a shooting drill on his phone, and she saw that his photo gallery screen was filled with pictures of her.

### Defendant Reiff and the Coaches Knew Howell Cloaked His Treatment of Women Soccer Players in Secrecy, yet Neither Reiff nor Butler Adequately Supervised Howell or Ensured the Safety of Ms. Doe and Her Teammates

111.    Defendant Reiff was aware that Howell created a "bubble" around the women's soccer players, including Ms. Doe, and refused to accept or allow anyone to assist him with the team.

112.    Defendant Reiff also knew that Howell focused on the women's soccer program at the expense of the men's tennis team.

113.    Coaches St. John and Alman, who accompanied the women's soccer team to every away game and tournament, knew that Howell provided treatment to female athletes in his private hotel room, instead of performing treatment in a conference room. Upon information and belief, Coaches St. John and Alman were not given protocols or otherwise trained by Defendant Reiff or Butler on safety standards for athletic trainers and athletes.

114.    It was widely known amongst Butler athletic staff that a third person should be present if an athletic trainer was providing treatment to student-athletes in a private hotel room.

115.    Coaches St. John and Alman never questioned or confronted Howell about treating women soccer players in his and others' private hotel rooms instead of the conference room, and they never entered a hotel room to observe his treatments or determine whether Ms. Doe or any other player was safe.  Upon information and belief, it is likely that the coaches' failure to act reasonably is a consequence of the lack of adequate training and protocols provided by Defendants Reiff and Butler.

15

116.    Coaches St. John and Alman knew that, by 2021, Howell stopped providing written reports detailing women soccer players' injuries and his treatment of the players, despite it being Howell's responsibility to do so. Defendant Reiff knew or should have known that Howell had stopped submitting written reports.

117.    Howell documented no treatment of Ms. Doe between October 2019 and March 2020, and he made no entries whatsoever, with respect to any player, after May 2020.

118.    Coaches St. John and Alman knew that in early September 2021, one of Ms. Doe's teammates submitted an anonymous complaint about Howell sharing a player's body composition data.

119.    Coaches St. John and Alman knew that Howell withheld treatment from players with whom he was displeased.

120.    Defendant Reiff did not reasonably supervise Howell's treatment of Ms. Doe or other athletes in the treatment room or at other locations, which was critical because Coaches St. John and Alman and other Butler personnel rarely entered the treatment room.

121.    Defendant Reiff did not take measures to ensure that Howell complied with athletic training practices designed to ensure student safety, which would have included treating student-athletes in common areas instead of a private hotel room with a bed; communicating with and appropriately "draping" or covering an athlete during treatment; asking for an athlete's permission to move her garment during treatment; having a trainer of the same sex assist if treatment in a private room is necessary; and properly recording treatments.

### *Ms. Doe and Other Women Soccer Players Reported Howell*

122.    On September 28, 2021, Ms. Doe and three other women soccer players – facing the prospect of private "treatment" in Howell's hotel room during an upcoming away game, and

out of concern for themselves and younger teammates – reported Howell's sexual misconduct to Coach St. John.

123.    The Butler athletes did not report Howell earlier because of the high regard in which he was held by Butler, how Butler's coaches spoke of him, and because of his intimidating and threatening manner towards players.

124.    Moreover, many of the student-athletes, like Ms. Doe, did not recognize that Howell's acts were sexually abusive due to, among other things, their lack of training and education on proper athletic trainer conduct, inexperience with athletic trainers, and youth; the trust and authority that the Butler athletic staff placed on Howell; and the general difficulty many laypeople have in identifying when medical or athletic treatment has crossed a line and constitutes sexual abuse or misconduct.

125.    Howell had gradually, treatment-by-treatment and inch-by-inch, escalated his misconduct toward Ms. Doe. She felt like she needed to do something, but she was scared, questioned what she felt, did not fully recognize what had been happening, and did not know whether anyone would believe her. It was only on or near September 27, 2021, when Ms. Doe overheard teammates discussing Howell's treatments, that she realized other people had similar experiences with Howell, which validated her own feelings.

126.    On September 29, 2021, Defendant Reiff told Howell a concern had been raised and that Howell would not be traveling with the women's soccer team to an away game the next day.

127.    Butler's Title IX Coordinator was specifically advised and made aware of the fact that Howell had been surreptitiously photographing and recording young female student-athletes on his Butler-issued phone.

128.    Butler alerted Howell to the complaints and investigation before contacting law enforcement, reviewing Howell's university-issued phone, or demanding possession of the phone so that photographs and videos of the athletes could be reviewed and prevented from being transferred or destroyed.

129.    Butler did not instruct Howell to preserve the contents of the phone for the Title IX investigation.

130.    Although multiple female athletes had reported Howell's serious sexual misconduct to Butler, Defendant Reiff instructed Howell to report to work on campus on October 1, 2021.

131.    Upon information and belief, by October 1, 2021, Howell had been instructed not to interact with the women's soccer players.

132.    On October 6, 2021, Howell was placed on administrative leave, and Butler's Title IX Coordinator filed a "formal" Title IX complaint against Howell.

133.    Between September 28, 2021, when Howell was first reported, and October 6, 2021, when he was placed on administrative leave, he made multiple attempts to interact with players in a manner that frightened them.

### Independent Counsel Investigated and Determined that Howell Had Sexually Harassed and Sexually Assaulted Ms. Doe

134.    Butler retained attorneys from the law firm of Church Church Hittle and Antrim to investigate the Title IX complaint against Howell.

135.    The investigation lasted approximately five months.

136.    Butler retained additional outside independent counsel to comprise the decision-making Title IX Panel that considered the information gathered through the investigation and presided over a five-day hearing on the complaints against Howell.

137.    During the investigation and/or hearings, Defendant Reiff and other Butler employees admitted that:

      a.      Butler had no written policies or procedures regarding proper athletic trainer conduct, setting boundaries with athletes, or working with athletes of the opposite sex;

      b.      An athletic trainer's active treatment for a student-athlete typically lasts 15-30 minutes, and an athletic massage typically lasts only 10 minutes;

      c.      There is no legitimate treatment reason for an athletic trainer to give full-body massages or go under a female athlete's underwear;

      d.      An athletic trainer's treatment of players during away games should take place in a conference room or common space, and if that is not possible, a third person, preferably of the same sex as the student, should be present for treatment;

      e.      Communication from an athletic trainer is imperative during treatment;

      f.      Athletic trainers must appropriately drape a student-athlete during treatment in order to shield the student-athlete's private body parts;

      g.      Athletic trainers should not provide individual workouts for players; and

      h.      It is improper for an athletic trainer to deny treatment to a student-athlete as a disciplinary consequence.

138.    The Title IX Panel determined, based on a preponderance of evidence, that Howell had sexually harassed and sexually assaulted Ms. Doe, in violation of Butler's sexual misconduct policies.

139.    Butler's sexual harassment policy provided, in pertinent part:

Sexual Harassment is unwelcome conduct on the basis of sex that satisfies the conditions outlined in (1), (2), and/or (3), below. "Unwelcome conduct" may include any unwelcome sexual advance, request for sexual favors, or other unwelcome conduct of a sexual nature, whether verbal, nonverbal, graphic, physical, electronic or otherwise.

3. Hostile Environment: Unwelcome conduct that is sufficiently severe, persistent, or pervasive that it unreasonably interferes with, limits, or

19

deprives an individual from participating in or benefitting from the University's education or employment programs and/or activities.

140.   Butler's sexual assault policy provided, in pertinent part:

Sexual Assault is engaging in any of the following knowing or intentional acts without consent:

1. Touching of the buttocks, breasts, groin or genitals of another, whether clothed or unclothed for the purpose of sexual gratification.

2. Touching another with any of these body parts for the purpose of sexual gratification,

3. Making another person touch you or themselves with or on any of these body parts for the purpose of sexual gratification.

141.   The Panel found that Howell exploited his authority and power over Ms. Doe to manipulate, sexually harass, and sexually assault her, which he did on multiple occasions, without her consent, and for his own sexual gratification.

142.   The Title IX Panel determined Ms. Doe did not consent, and could not consent, to Howell's touching of her vaginal area, groin, and breasts, or rubbing his erect penis against her, because of the "coercive nature of the power dynamic between" Howell and Ms. Doe. The Panel succinctly stated, "[c]onsent is simply not in question here."

143.   The Panel stated:

It somewhat goes without saying that by creating an environment in which he could, and this Panel finds, did, expose and view [Ms. Doe's] genitals, massage her upper groin to the point where he brushed his fingers across her labia, and press his genitals against her outstretched hand, [Howell] had engaged in behavior that constituted sexual harassment of [Ms. Doe]. We find, however, that the course of conduct began well before those actions and stemmed from a trusting relationship that was forged by [Howell] with [Ms. Doe] and then was manipulated in order to push the boundaries of acceptable behavior, slowly and steadily, until the sexual touching occurred.

144.    The Panel determined that Howell had also sexually assaulted and harassed other members of the Butler women's soccer team who complained about him in the fall of 2021, "evidencing a widespread pattern of inappropriate conduct."

145.    The Panel determined, "[g]iven the sensitive nature of the position of athletic trainer, the exposure it presents to the student athletes and to Butler University, and the reckless and inappropriate behaviors of [Howell], there is simply no safe manner in which to allow him to proceed with his position at the University."

146.    The Panel found that "[Howell] shows no remorse, and in fact appears angry and indignant at having any of his actions called into question."

147.    The Panel recommended that Butler terminate Howell's employment with no opportunity for rehire and permanently revoke his rights to be on campus or attend any university-sponsored events.

148.    Since 2012, when Howell started as an athletic trainer at Butler, Howell has had access to hundreds, if not thousands, of young female athletes.

149.    Upon information and belief, following the investigation and the Panel Findings, Butler has not reached out to a single former athlete to understand the depth of Howell's misconduct, offer help to those who may be survivors of his abuse, or otherwise take responsibility for the harm caused to athletes by someone under its employ.

### Defendants Butler and Reiff Ignored the NCAA's Warning Regarding the Foreseeability of Athletic Staff-on-Student Sexual Abuse and the Need for Policies and Training to Prevent the Same

150.    Over a decade ago, the NCAA published *Staying In Bounds – an NCAA Model Policy to Prevent Inappropriate Relationships between Student-Athletes and Athletics Department Personnel* ("NCAA *Staying In Bounds* Publication"), a resource "designed to ensure

that student-athletes are safe from sexual advances by coaches or other athletic department employees."

151.    The 2012 publication described sexual abuse in the collegiate athletic context as "a slow seduction (or 'grooming') whereby one person gradually prepares another to accept 'special' attention, and then proceed with sexual activity."

152.    The NCAA explained, because of the power differential between athletic staff and student-athletes, any sexual activity between the two inherently constitutes sexual abuse.

153.    The NCAA emphasized the need for "colleges and universities[to] take reasonable steps to prevent unprofessional and potentially harmful relationships between student-athletes and athletics department staff – especially because . . . **the development of such relationships, and their potentially harmful consequences for athletes, are entirely foreseeable**."

154.    The "reasonable steps" identified by the NCAA included implementing and educating all athletic staff and student-athletes on policies intended to prevent staff-on-athlete sexual abuse.

155.    The Title IX Panel's findings – that Butler had no written policies or procedures regarding proper athletic trainer conduct, setting boundaries with athletes, or working with athletes of the opposite sex – establishes that Defendants Butler and Reiff ignored the NCAA's notice and warnings, to the great detriment of Ms. Doe and other female student-athletes.

### *Independent Counsel Investigated and Determined that Ms. Doe Suffers Severe Injuries*

156.    Butler's own Title IX Panel determined, "[t]he harm to [Ms. Doe] was severe and the effects resulting therefrom are likely to be profound and lasting."

157.    As a direct and proximate result of Defendants' egregious actions and inactions, Ms. Doe has significantly suffered, and for the foreseeable future will continue to suffer severe physical, emotional, and other injuries and damages.

## COUNT I
### Negligence
### (Defendants Butler and Reiff)

158.    Plaintiff Jane Doe 4 incorporates all preceding paragraphs into this Count by reference as though fully restated herein.

159.    Defendants Butler and Reiff owed duties to Ms. Doe to conform their conduct to an appropriate standard of care to prevent, investigate, train other staff to recognize and report, and remediate athletic trainer sexual abuse, sexual harassment, sexual assault, stalking, grooming, and other misconduct against Ms. Doe and other student-athletes.

160.    Defendants voluntarily assumed these duties when they undertook to employ, supervise, utilize and/or direct female athletes to Howell as an athletic trainer to provide treatment to such athletes, including Ms. Doe, and held him out as a trusted and valuable employee.

161.    Defendants' undertaking and assumption of these duties created a special relationship between them, other Butler staff, and Ms. Doe, and corresponding duties to act in the manner of a reasonably prudent person.

162.    Ms. Doe relied on Defendants' exercise of reasonable care in this undertaking, to protect her from sexual abuse, sexual harassment, sexual assault, grooming, and other misconduct at the hands of Butler's athletic trainer.

163.    Ms. Doe relied on Defendants' exercise of reasonable care so that she could participate in women's soccer, for which she had been recruited, without being subjected to

sexual abuse, sexual harassment, sexual assault, grooming, and other misconduct by Butler's training staff.

164.     The three-part balancing test utilized by the Indiana Supreme Court in *Pfenning v. Lineman*, 947 N.E.2d 392 (Ind. 2011), also establishes that Defendants owed these duties to Ms. Doe.

165.     Defendants held out and represented Howell as a trusted and valued athletic trainer who student-athletes like Ms. Doe – a vulnerable young woman who, as was true of most of her teammates, had little to no experience with athletic trainers – should trust, rely on, and go to for athletic treatment. Defendant Reiff undertook and was otherwise charged with the supervision of Howell necessary to ensure that such trust and reliance was well-placed and that the athletes were safe.

166.     As the sole athletic trainer for Butler women's soccer team, under Defendant Reiff's direct supervision, Howell was the Butler employee responsible for providing treatment to female athletes, and his responsibilities included treating young women and having access to intimate and private areas of their bodies in vulnerable situations and circumstances.

167.     The risk of Howell sexually abusing, sexually harassing, sexually assaulting, grooming, and perpetrating other misconduct against female students was reasonably foreseeable given that Howell – as Defendants admittedly knew – possessed great and unique authority and power over the student-athletes entrusted to his care, and he carried out his responsibilities largely without supervision and often in privacy, including his own and others' hotel rooms.

168.     The risk of Howell sexually abusing, sexually harassing, sexually assaulting, stalking, grooming, and perpetrating other misconduct against female student-athletes was reasonably foreseeable given the 2012 NCAA *Staying In Bounds* Publication and the high-profile

nature of treatment providers' prolific sexual abuse and assault of students and athletes, including but not limited to that of Larry Nassar, Robert Anderson, Richard Strauss, and James Heaps.

169.    Public policy considerations also weigh heavily in favor of imposing these duties on Defendants.

170.    Indiana has codified this social norm and attendant duties and prohibits an athletic trainer from engaging in lewd or immoral conduct or sexual contact with a person the trainer is treating. Ind. Code § 25-1-9-4 (2017).

171.    Student-athletes reasonably expect that universities and their employees will protect them and keep them safe from athletic trainer sexual abuse, sexual harassment, sexual assault, grooming, and other misconduct.

172.    Reasonable persons would recognize and agree that such duties exist.

173.    Defendants breached their duties and failed to conform their conduct to the requisite standard of care due to Ms. Doe by, among other things:

    a.    Permitting Howell to provide treatment to female athletes, including Ms. Doe, in private hotel rooms, including his own, without staff or a third person present;

    b.    Failing to supervise Howell during his treatment of Ms. Doe and other female athletes, including in his private hotel room, other private hotel rooms, the windowless physician's office, and the training room;

    c.    Failing to train or educate student-athletes, coaches, and staff regarding employee-on-student-athlete sexual assault, sexual harassment, sexual abuse, grooming, inappropriate touch, boundaries, proper athletic treatment and massage, Title IX, athletic training standard practices and procedures, or reporting complaints or concerns regarding the same;

    d.    Failing to have policies and protocols in place designed to protect student-athletes like Ms. Doe from athletic staff sexual assault, sexual harassment, sexual abuse, grooming, inappropriate touch, violation of boundaries, and improper athletic treatment and massage;

e.   Failing to investigate when Howell ceased providing written reports of his treatment of student-athletes including Ms. Doe, and repeatedly provided treatment to Ms. Doe and other members of the women's soccer team in private hotel rooms, including his own;

f.   Failing to monitor athletes, their injuries, the content or absence of required reports, the specific care they were receiving, and the progression of their treatments;

g.   Failing to prevent Howell from accessing or approaching Ms. Doe and other female students, after they had reported him to Butler coaches and officials for sexual misconduct; and

h.   Failing to prevent Howell from destroying and deleting photographs, videos, and other evidence from his university-issued cell phone.

174.   Defendant Butler is vicariously liable for its employees' negligence under the doctrine of respondeat superior.

175.   At all relevant times, Defendant Reiff's negligent acts and omissions, as well as those of the coaches, arose within the scope of their employment as athletic staff hired by Defendant Butler and as agents of Butler and were in furtherance of Butler's business and interests in the success of the women's soccer team; operating, managing and supervising the team; and training and caring for Ms. Doe and other student-athletes so that the team would compete for and on behalf of Butler and its athletic program.

176.   As a direct and proximate result of Defendants' negligent actions and inaction, Ms. Doe was sexually assaulted, sexually harassed, groomed, and abused for years, and she suffered and continues to suffer severe physical and emotional injuries, distress, and other injuries and damages for which she is entitled to be compensated.

**COUNT II**
**Gross Negligence**
**(Defendants Butler and Reiff)**

177.   Plaintiff Jane Doe 4 incorporates all preceding paragraphs into this Count by reference as though fully restated herein.

178.   Defendants Butler and Reiff's acts and omissions, as well as those of the coaches, in breach of their duties to Ms. Doe set forth above were in reckless disregard of the high risk of harm and consequences to Ms. Doe.

179.   As the sole athletic trainer for Butler women's soccer team, Howell possessed unique authority and power over female athletes and access to their bodies in vulnerable circumstances and environments.

180.   It was obvious that Howell – left unsupervised and unmonitored, and with no protocols, education or training provided to student-athletes or athletic staff regarding employee-on-student-athlete sexual assault or trainer boundaries, protocols and practices – posed an unjustifiably high risk of harming the female student-athletes entrusted to his care.

181.   This risk was known to Defendants and/or so obvious that it should have been known to Defendants, particularly considering the 2012 NCAA *Staying In Bounds* Publication and treatment providers' widely publicized sexual abuse and assault of students and athletes, including but not limited to that of Larry Nassar, Robert Anderson, Richard Strauss, and James Heaps.

182.   Defendant Butler is vicariously liable for its employees' gross negligence under the doctrine of respondeat superior.

183.   At all relevant times, Defendant Reiff's grossly negligent acts and omissions, as well as those of the coaches, arose and were within the scope of their employment as athletic

staff hired by Defendant Butler and as agents of Butler and were in furtherance of Butler's business and interests in the success of the women's soccer team; operating, managing and supervising the team; and training and caring for Ms. Doe and other student-athletes so that the team would compete for and on behalf of Butler and its athletic program.

184.     As a direct and proximate result of Defendants' grossly negligent actions and inaction, Ms. Doe was sexually assaulted, stalked, sexually harassed, groomed, and abused for years, and suffered and continues to suffer severe physical and emotional injuries, distress, and other injuries and damages for which she is entitled to be compensated.

## COUNT III
### Battery
### (Defendants Butler and Howell)

185.     Plaintiff Jane Doe 4 incorporates all preceding paragraphs into this Count by reference as though fully restated herein.

186.     Defendant Howell intended to cause harmful and/or offensive contact with Ms. Doe, and an imminent apprehension of such contact, when he repeatedly and illicitly touched her breasts, touched her outer vaginal area, touched other areas of her body, and rubbed his genitalia and erect penis on her, and he directly harmed Ms. Doe as a result.

187.     Defendant Howell acted recklessly and/or with reckless disregard of the consequences when he repeatedly and illicitly touched Ms. Doe's breasts, touched her outer vaginal area, touched other areas of her body, and rubbed his genitalia and erect penis on her.

188.     Defendant Howell's sexual motivation and misconduct are considered aggravating conduct for the tort of battery against Ms. Doe.

189.    Ms. Doe did not consent to Defendant Howell illicitly touching her breasts, touching her outer vaginal area, touching other areas of her body, or rubbing his genitalia and erect penis on her.

190.    Defendant Howell's illicit touching of Ms. Doe's breasts, touching of her outer vaginal area, touching of other areas of her body, and rubbing his genitalia and erect penis on her would offend a person with a reasonable sense of personal dignity.

191.    Nonconsensual contact of a sexual nature is inherently offensive.

192.    Defendant Butler is vicariously liable for Defendant Howell's battery on Ms. Doe under the doctrine of respondeat superior.

193.    At all relevant times, Howell was employed by Butler as an athletic trainer, primarily and purportedly working with the women's soccer team to remedy and prevent injuries through physical treatments.

194.    Defendant Howell, as an employee and agent of Butler, battered Ms. Doe in the course of providing her physical treatment.

195.    Defendant Howell battered Ms. Doe while he was performing some authorized acts that were within the scope of his employment, related to services he provided as an athletic trainer, and motivated to an extent by Butler's business and interest in the success of the women's soccer team and training and caring for Ms. Doe and other female athletes so that the team would compete for and on behalf of Butler and its athletic program.

196.    As a direct and proximate result of Defendants' battery, Ms. Doe suffered and continues to suffer severe physical and emotional injuries, distress, and other injuries and damages for which she is entitled to be compensated.

29

## COUNT IV
### Assault
### (Defendants Butler and Howell)

197.    Plaintiff Jane Doe 4 incorporates all preceding paragraphs into this Count by reference as though fully restated herein.

198.    Defendant Howell acted with the intent to cause harmful and/or offensive contact with Ms. Doe when he treated and massaged her, including by touching her outer vaginal area, touching her breasts, touching other areas of her body, and rubbing his genitalia and erect penis on her, and caused Ms. Doe to reasonably fear that he would continue to touch her vaginal area, breasts, and body in other lurid ways.

199.    Butler is vicariously liable for Defendant Howell's assaults on Ms. Doe under the doctrine of respondeat superior.

200.    At all relevant times, Howell was employed by Butler as an athletic trainer, primarily and purportedly working with the women's soccer team to remedy and prevent injuries through physical treatments.

201.    Defendant Howell, as an employee and agent of Butler, assaulted Ms. Doe in the course of providing her physical treatment.

202.    Defendant Howell assaulted Ms. Doe while he was performing some authorized acts that were within the scope of his employment, related to services he provided as an athletic trainer, and motivated to an extent by Butler's business and interest in the success of the women's soccer team and training and caring for Ms. Doe and other female athletes so that the team would compete for and on behalf of Butler and its athletic program.

203.     As a direct and proximate result of Defendants' assaults, Ms. Doe suffered and continues to suffer severe physical and emotional injuries, distress, and other injuries and damages for which she is entitled to be compensated.

## COUNT V
### Intentional Infliction of Emotional Distress
### (Defendants Butler and Howell)

204.     Plaintiff Jane Doe 4 incorporates all preceding paragraphs into this Count by reference as though fully restated herein.

205.     Defendant Howell's abuse of his position of authority and power as a Butler athletic trainer and grooming, manipulating, and sexually abusing Ms. Doe, a vulnerable student-athlete, was atrocious, constitutes extreme and outrageous conduct that exceeds all bounds usually tolerated by a decent society, and is utterly intolerable in a civilized community based upon prevailing cultural norms and values.

206.     Defendant Howell's abuse of his position of authority and power as a Butler athletic trainer and grooming, manipulating, and sexually abusing Ms. Doe intentionally or recklessly caused her to suffer severe emotional distress.

207.     Butler is vicariously liable for Defendant Howell's intentional infliction of emotional distress under the doctrine of respondeat superior.

208.     Defendant Howell, as an employee and agent of Butler, abused his position of authority and power over Ms. Doe and groomed, manipulated, and sexually abused her in the course of providing her physical treatment and other services as a Butler athletic trainer assigned to treat her and the women's soccer team so that the team would compete for and on behalf of Butler and its athletic program.

31

209.    Defendant Howell abused his position of authority and power over Ms. Doe and groomed, manipulated, and sexually abused her while he was performing some authorized acts that were within the scope of his employment, related to services he provided as an athletic trainer, and motivated to an extent by Butler's business and interest in the success of the women's soccer team and training and caring for Ms. Doe and other female athletes on the team.

210.    As a direct and proximate result of Defendants' intentional infliction of emotional distress, Ms. Doe suffered and continues to suffer severe physical and emotional injuries, distress, and other injuries and damages for which she is entitled to be compensated.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jane Doe 4 requests entry of JUDGMENT in her favor and against Defendants: compensating her for her injuries and damages including, but not limited to, compensatory damages, past, present, and future physical and psychological pain, suffering and impairment, medical bills, counseling, and other costs and expenses for past and future medical and psychological care and lost earnings; awarding punitive damages allowable under law; and for such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury.

[*Signatures on Following Page*]

Respectfully submitted,

Date: August 17, 2023

THE FIERBERG NATIONAL LAW          COHEN & MALAD, LLP
GROUP, PLLC

/s/ Monica H. Beck                 /s/ Andrea R. Simmons
Monica H. Beck*                    Andrea R. Simmons
Rachel Denhollander*               Greg L. Laker
Douglas E. Fierberg*               One Indiana Square, Suite 1400
201 East 17th Street, Suite A      Indianapolis, IN 46204
Traverse City, MI 49684            T: (317) 636-6481
T: (231) 933-0180                  F: (317) 636-2593
F: (231) 252-8100                  asimmons@cohenandmalad.com
mbeck@tfnlgroup.com                glaker@cohenandmalad.com
rdenhollander@tfnlgroup.com
dfierberg@tfnlgroup.com
*pro hac vice motions to be filed

*Attorneys for Plaintiff*